# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

**David R. Farris**                                                                          **Plaintiff**

### No. 4:11-CV-459-JMM

**Michael J. Astrue, Commissioner,**                                           **Defendant**
**Social Security Administration**

### ORDER AFFIRMING THE COMMISSIONER'S DECISION

In this case, plaintiff-claimant David R. Farris sought judicial review of

defendant Commissioner Michael J. Astrue's denial of his applications for disability

income benefits (DIB) and supplemental security income (SSI).  Farris asked the court to

reverse the Commissioner's decision and remand his case to the Social Security

Administration (SSA) for the award of benefits.[1]  In the alternative, he asked the court to

reverse the decision and remand his case for another hearing.  After considering the

record, the arguments of the parties, and the applicable law, this court affirms the

Commissioner's decision.

**Scope of judicial review**.  In reviewing a decision denying an application for

disability benefits, the court must determine whether substantial evidence supports the

Commissioner's decision and whether the Commissioner made a legal error.[2]

---

[1]Docket entry # 2.

[2]*See* 42 U.S.C. § 405(g) (requiring the district court to determine whether the
Commissioner's findings are supported by substantial evidence and whether the
Commissioner conformed with applicable regulations); *Slusser v. Astrue*, 557 F.3d 923,

Substantial evidence is more than a mere scintilla of evidence; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[3]  In determining whether substantial evidence supports the Commissioner's decision, the court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports the decision, but the court may not reverse the Commissioner's decision simply because substantial evidence supports a contrary decision.[4]

**The disputed issues**.  The parties did not dispute that Farris exhausted his administrative remedies[5] or that the Commissioner's administrative law judge (ALJ) followed the required five-step process for determining whether a DIB/SSI claimant is disabled.[6]  Instead, Farris complained about the following aspects of the

───────────────

925 (8th Cir. 2009) (stating that the court's "review of the Commissioner's denial of benefits is limited to whether the decision is 'supported by substantial evidence in the record as a whole'"); *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) ("We will uphold the Commissioner's decision to deny an applicant disability benefits if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled.").

[3]*See Slusser*, 557 F.3d at 925.

[4]*See Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

[5]*See Anderson v. Sullivan*, 959 F.2d 690, 692 (8th Cir. 1992) (stating that "the Social Security Act precludes general federal subject matter jurisdiction until administrative remedies have been exhausted" and explaining that the Commissioner's appeal procedure permits claimants to appeal only final decisions).

[6]*See* 20 C.F.R. § 404.1520 (setting forth the five-step sequential evaluation process used for determining whether a claimant is disabled and entitled to disability benefits);

Commissioner's decision:

> (1) the ALJ's determinations about chronic obstructive pulmonary disease, or COPD;
>
> (2) the weight given to a treating physician's opinion;
>
> (3) the ALJ's evaluation of Farris's credibility; and
>
> (4) the decision's inconsistency with a subsequent disability determination.

Based on these complaints, Farris argued that substantial evidence does not support the Commissioner's conclusion that he is not disabled. Farris also maintained the Commissioner's decision does not comport with required legal standards.

**The Commissioner's decision**. Before applying for disability benefits, Farris worked for Central Freight Lines as a truck driver.[7] He worked for that company for almost seven years. Farris testified that he stopped working on May 5, 2006, after slipping while getting out of the bathtub.

By that time, Farris had already undergone neck surgery[8] and hernia-repair

---

20 C.F.R. § 416.920 (setting forth the five-step sequential evaluation process for determining whether a claimant is disabled and entitled to SSI).

[7]SSA record at pp. 35 & 144.

[8]*Id*. at p. 179 (operative report for anterior diskectomy and bilateral foraminotomies at C5, C6; C5, C6 arthrodesis with interbody allograft; local autograft and plate; intraoperative fluoroscopy for localization and placement of the plate; all for herniated nucleus pulpous at C5-C6).

surgery.[9]  Farris's medical records date back to February 2, 2004,[10] but the medical

records mention only one fall.  On May 22, 2006, Farris reported having "another fall."[11]

A MRI taken a couple of weeks later revealed a moderate-sized herniated disc in

Farris's neck.[12]  Two months later, Farris underwent a second neck surgery.[13]  Later, he

underwent a second hernia surgery.[14]

Farris filed the applications underlying this review on August 22, 2008, and

alleged disability based on neck pain, back pain, a crushed right ankle, a hernia, and

high blood pressure.[15]  Farris applied for disability benefits once before.  The

---

[9]*Id*. at p. 194 (operative report for repair of multiple incisional hernias).

[10]*Id*. at p. 340 (office visit with Dr. Norman Pledger; complaints about back pain and high blood pressure).

[11]*Id*. at p. 261 (complaining to Dr. Pledger that he was losing feeling in left arm and leg, had gotten better from last visit, and had another fall).

[12]*Id*. at p. 346 (reporting left paracentral and left lateral recess herniated disc which is moderate in size at C6-7 causing moderate spinal canal stenosis and compression on the left aspect of the thecal sac; moderate to severe left neural foraminal narrowing and no significant right neural foraminal narrowing; post-surgical changes at C5-6 with susceptibility artifact at these levels; and loss of normal cervical lordosis).

[13]*Id*. at p. 218 (operative report for C6-7 anterior diskectomy and bilateral foraminotomies; C6-7 arthrodesis with electronic bone simulation cage and local autograft; anC6-7 anterior plate; and intraoperative fluoroscopy for location, placement of spacer, and placement of plate).

[14]*Id*. at p. 231 (operative note for removing old intra-abdominal mesh and replacing old mesh new, low profile mesh).

[15]*Id*. at p. 125.

4

Commissioner denied the applications on August 15, 2007.[16]  Because Farris did not

appeal that decision, the earliest Farris could receive benefits was August 15, 2007, even

though he maintained he became disabled on May 6, 2006.

After considering Farris's second DIB/SSI applications, the ALJ determined that

despite having severe impairments—degenerative disc disease of the cervical spine

status post-fusion at C5-C6 and C6-C7, mild degenerative disc disease of the lumbar

spine at L4-L5, abdominal hernias status post surgical repair, and hypertension (in

laymen's terms, high blood pressure)[17]—Farris had the RFC[18] to perform light work, but

needed a sit/stand option and a working environment without temperature extremes,

dust, fumes or smoke.[19]

The ALJ consulted with a vocational expert and determined Farris could no

longer perform his past work, but could perform other work that existed in significant

numbers in the national economy.[20]  Because the ALJ determined Farris could do other

---

[16]*Id*. at p. 120 (indicating that prior application was denied on Aug. 15, 2007).

[17]*Id*. at p. 16.

[18]The Commissioner's regulations define RFC as "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1) (DIB) & 20 C.F.R. § 416.945(a) (SSI).

[19]SSA record at p. 19.

[20]*Id*. at p. 24.

work, the ALJ concluded that Farris was not disabled under the Social Security Act.[21]

The ALJ's decision became the final decision of the Commissioner for the purpose of

judicial review pursuant to 42 U.S.C. § 405(g).

**Substantial evidence supports the Commissioner's decision**.  The following

substantial evidence supports the Commissioner's conclusion that Farris was not

disabled: (1) treating physician Norman Pledger's treatment notes, (2) treating surgeon

A. Scott Marotti's treatment notes, (3) evidence about Farris's neck surgeries, and (4)

vocational expert testimony.

Dr. Pledger's treatment notes.  Dr. Pledger is a family practice doctor.  He began

treating Farris in February 2004.[22]  Dr. Pledger's treatment notes support the

Commissioner's decision because the notes documented Farris's complaints of back

pain, neck pain, and hernias; and contained diagnoses for high blood pressure and

COPD.  Dr. Pledger documented Farris's history of smoking two packs of cigarettes per

---

[21]*Id*.  To be disabled under the Social Security Act, a claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

[22]SSA record at p. 340 (check-up during which Farris complained about back pain and high blood pressure).

day for 30 years,[23] and advised Farris to stop smoking.[24]  The treatment notes included

reports from the surgeons who operated on Farris's neck and hernias.

Periodically, Dr. Pledger characterized Farris's neck pain and/or back pain as

aggravated,[25] but otherwise characterized his conditions as "controlled" or "stable."[26]

In all but one instance—when Farris was out of medications[27]—Dr. Pledger

characterized Farris's blood pressure as "controlled."[28]  Dr. Pledger completed a

"medical assessment of ability to do work-related activities (physical)" on September 2,

2009—opining that Farris's ability to lift, stand, sit, climb, stoop, crouch, kneel, crawl,

balance, and reach were impaired[29]—but the treatment notes documented no limitations

in those exertional functions.

---

[23]*Id*. at pp. 338 & 442.

[24]*Id*. at p. 291 (Aug. 15, 2005) & p. 449 (Sep. 10, 2008).

[25]*Id*. at p. 289 (Sept. 6, 2005); p. 266 (Apr. 20, 2006); p. 262 (May 22, 2006); p. 260 (July 17, 2006).

[26]*Id*. at p. 319 (Oct. 3, 2004, controlled); p. 299 (May 5, 2005, controlled); p. 284 (Oct. 10, 05, controlled); p. 280 (Dec. 5, 2005, controlled); p. 276 (Jan. 23, 2006, controlled); p. 270 (Mar. 7, 2006, stable).

[27]*Id*. at p. 417 (Mar. 13, 2008, characterizing blood pressure as uncontrolled).

[28]*Id*. at p. 319 (Oct. 13, 2004); p. 299 (May 3, 2005); p. 284 (Oct. 10, 2005); p. 280 (Dec. 5, 2005); p. 276 (Jan. 23, 2006); p. 424 (May 17, 2007, reporting normal blood pressure readings); p. 421 (Aug. 14, 2009, reporting normal blood pressure readings).

[29]*Id*. at p. 26.

Dr. Pledger's treatment notes support the ALJ's determination that Farris could perform light work because Dr. Pledger documented no exertional limitations.  Dr. Pledger's diagnosis of COPD and his documentation of Farris's smoking support the ALJ's determination that Farris must work in a working environment without temperature extremes, dust, fumes or smoke, because such conditions could irritate Farris's ability to breath.[30]

Dr. Marotti's treatment notes.  Dr. Marotti is a general surgeon who repaired Farris's hernias.  He performed the first surgery on September 26, 2005.[31]  Dr. Marotti released Farris to return to work 67 days later, reporting that the wound looked fantastic and well-healed.[32]  Farris did fine for about 18 months and then experienced abdominal pain.[33]  Dr. Marotti performed a second, exploratory surgery to determine whether Farris had a new hernia or whether the mesh used for the first surgery should

---

[30]*See* 2 The Gale Encyclopedia of Med. 1024, 1027 (4th ed.) (explaining that smoking cigarettes, and occupational chemicals, dusts, and airborne particles in the workplace, lead to COPD; and recommending that people with COPD avoid excessively low or high temperatures).

[31] SSA record at p. 194 (operative report for the repair of multiple incisional hernias).

[32]*Id*. at p. 227.

[33]*Id*. at 462 (complaining to Dr. Pledger on Mar. 13, 2007 about abdominal pain); p. 225 (reporting abdominal pain to Dr. Marotti on Apr. 2, 2007).

be replaced.[34]

Dr. Marotti found no new hernia, but replaced the old, thicker mesh used in the first surgery with a new, low profile mesh.[35]  Sixteen days later, Dr. Marotti released Farris for "regular activities."[36]  Notably, the release occurred 11 months and 14 days after Farris alleged he became disabled due to hernias.

Dr. Marotti's treatment notes support the ALJ's determination because Dr. Marotti reported that Farris was free of hernias and pain, and because he released Farris without restrictions in exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  Release without exertional limitation contradicts Farris's allegation that he was disabled due to hernias.

Evidence about Farris's neck surgeries.  Dr. J. Michael Calhoun performed Farris's neck surgeries.  Dr. Calhoun specializes in surgical treatment of spinal disorders.  Dr. Calhoun first operated on Farris's neck on September 2, 2004.[37]  Farris

---

[34]*Id*. at p. 404 (documenting a Apr. 2, 2007 surgery consultation between Dr. Marotti and Farris).

[35]*Id*. at p. 23.

[36]*Id*. at p. 224 (writing that Farris felt much better); p. 223 (reporting to Dr. Pledger that Farris was no longer having the pain he had before the surgery).

[37]*Id*. at p. 179 (Dr. Calhoun's operative report).

reported to Dr. Pledger that he felt better after the surgery,[38] but complained to Dr.

Pledger about neck pain a couple of weeks after he fell in the bathtub.[39] Dr. Pledger

sent Farris back to Dr. Calhoun.[40]

Dr. Calhoun found post operative changes in Farris's neck and significant disc

herniation.[41] After non-surgical treatment failed to resolve Farris's problems,[42] Dr.

Calhoun performed a second surgery—on July 18, 2006.[43] Dr. Calhoun's last treatment

note was embodied in a letter to Dr. Pledger.

In the letter, Dr. Calhoun reported that Farris was "having some right arm pain

especially when he adbuct[ed] the shoulder."[44] Dr. Calhoun advised that Farris would

return in two weeks with a lateral cervical spine Xray and stated that Farris was "not

---

[38]*Id.* at p. 316, and Dr. Calhoun released Farris to return to normal activities; *id.* at p. 356 (stating that we "will unrestrict his activity").

[39]*Id.* at p. 261 (reporting the loss of feeling on the left arm and leg and complaining about neck and back pain).

[40]*Id.* at p. 264.

[41]*Id.* at 346 (MRI results dated May 23, 2006); p. 353 (reporting the results of the MRI to Dr. Pledger).

[42]*Id.* at 353 (reporting on June 30, 2006 that physical therapy made Farris's symptoms worse); p. 214 (stating that Farris was treated with physical therapy and medication to no avail).

[43]*Id.* at p. 218 (Dr. Calhoun's operative report).

[44]*Id.* at p. 349.

yet released to work."[45]

Because the letter was the last report about Farris's condition, Dr. Calhoun's treatment notes did not indicate whether Farris returned to Dr. Calhoun or whether Dr. Calhoun released Farris for work.  The record, however, contained medical evidence reflecting the result of Farris' second neck surgery—the report of an agency examination on July 26, 2007.

The report appears to have flowed from Farris's first applications.  In the report, Dr. Gary P. Nunn reported that Farris's neck had a "very limited range of motion to approximately 20 degrees bilaterally."[46]  The normal range for lateral bending is 40 to 50 degrees; that is, a person should be able to move his head about halfway between straight ahead and the shoulder.[47]  A limited range of motion was significant in determining Farris's RFC because a limited range of motion can hamper many normal

---

[45]*Id.*

[46]*Id.* at p. 409.

[47]*See* 2-26A Courtroom Med. - The Neck § 26A.00 ("The normal range of motion for the cervical spine…for lateral bending is 40 to 50 degrees, and for rotation 60 to 80 degrees."); 1-15 Courtroom Med. - The Neck § 15.35, fig. 15.6 (showing the range of lateral bending or flexion as 40 degrees from straight ahead to the shoulder).  *But see* Lorne Label, M.D. & Mary Kroul, 4-10A Attorneys' Textbook of Med. (3d ed.) P 10A.50 ("Lateral bending is measured by asking the patient to attempt to bring his or her ear to shoulder level, first on one side and then on the other. The physician notes the angles made by the cervical spine as it diverges from an imaginary center. Normal lateral flexion is in the 20-45 degree range.").

activities.[48]

Dr. Nunn's report served, in part, as the basis for a subsequent RFC assessment.

On September 23, 2008, after reviewing Dr. Nunn's report and Farris's medical records,

an agency consulting physician opined that Farris could lift 20 pounds occasionally and

10 pounds frequently, stand and/or walk about 6 hours in an 8-hour day, and sit about 6

hours in an 8-hour day.[49]   The consultant further opined that Farris lacked postural

limitations.   The consultant's opinion was consistent with the ability to perform light

work.[50]   Because of the consistency, the evidence about Farris's neck surgery supports

the ALJ's determination that Farris could perform light work, albeit with a limited

range of motion in his neck.

Vocational expert testimony.   The vocational expert at Farris's hearing testified

that a person with Farris's RFC could work as an office helper or a bench assembler.[51]

The vocational expert testified that these jobs existed in significant numbers in the

---

[48]*See* 2 The Gale Encyclopedia of Med. 921 (4th ed.) (explaining how cervical disc
disease often causes pain and limits motion).

[49]SSA record at p. 408.

[50]*See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20
pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.
Even though the weight lifted may be very little, a job is in this category when it
requires a good deal of walking or standing, or when it involves sitting most of the time
with some pushing and pulling of arm or leg controls.").

[51]SSA record at p. 53.

national economy; respectively, 100,000 nationwide and 1,000 in Arkansas; and 150,000 nationwide and 2,000 in Arkansas.[52]  This testimony supports the ALJ's decision because it indicated Farris could do work that existed in significant numbers in the national economy.

The foregoing evidence constituted more than a mere scintilla of evidence.  A reasonable mind would accept this evidence as adequate to support the conclusion that Farris was not disabled.  For these reasons, the foregoing evidence constitutes substantial evidence.

**The Commissioner's decision comports with applicable legal standards**.

The ALJ's determinations about COPD.  Farris complained that the ALJ determined his COPD was not a severe impairment, but incorporated limitations flowing from COPD in the RFC determination.[53]  For this reason, Farris argued that Commissioner's treatment of COPD was inconsistent.  Farris also argued that the ALJ's determination about whether his impairments met a listed impairment was flawed because the ALJ did not fully address COPD.

At the step two of the disability-determination process, the ALJ considers the

---

[52]*Id*.

[53]Docket entry # 15, p. 4.

medical severity of the claimant's impairment.[54]  To be severe, an impairment must

significantly limit the claimant's physical or mental ability to do basic work activities.[55]

"An impairment…is not severe if it does not significantly limit [the] physical or mental

ability to do basic work activities."[56]  The ability to do basic work activities includes

"[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling,

reaching, carrying, or handling."[57]

In this case, the ALJ provided the following explanation about why COPD was

not a severe impairment:

> This condition was diagnosed by Dr. Pledger in March 2008.  There are no
> objective medical tests confirming the diagnosis.  Mr. Farris is not taking
> any medication for the disorder and it was noted on several occasions by
> Dr. Pledger that the claimant continued to smoke despite
> recommendations that he stop doing so.  Dr. Pledger did not indicate in
> his September 2009 medical opinion that the claimant had any
> environmental restrictions due to his alleged chronic obstructive
> pulmonary disease.[58]

This explanation is sound for the following reasons.

---

[54]20 C.F.R. 404.1520(a)(4)(ii) (DIB); 20 C.F.R. § 416.920(a)(4)(ii) (SSI).

[55]*See* 20 C.F.R. § 404.1520(c) (explaining that a claimant must "have any
impairment or combination of impairments which significantly limits [the claimant's]
physical or mental ability to do basic work activities").  *See also* 20 C.F.R. § 416.920(c)
(SSI).

[56]20 C.F.R. § 404.1521(a) (DIB); 20 C.F.R. § 416.921(a) (SSI).

[57]20 C.F.R. § 404.1521(b) (DIB); 20 C.F.R. § 416.921(b) (SSI).

[58]SSA record at p. 18 (record citations omitted).

> A history of heavy smoking is not enough to diagnose COPD.  The first
> step in making a diagnosis is a good medical evaluation, including a
> medical history and a physical examination of the chest using a
> stethoscope.  This may be followed by a variety of tests to evaluate lung
> function.[59]

Diagnostic tests for evaluating lung function include pulmonary function tests,

diffusion studies, blood samples, chest Xrays, and blood and sputum tests.[60]  Dr.

Pledger's diagnosis was not based on any diagnostic test.  Instead, Dr. Pledger's

treatment notes suggested the diagnosis was based on smoking alone.[61]  Notably, Dr.

Pledger recorded "negative" examination findings for Farris's chest and lungs on the

day he diagnosed Farris with COPD.[62]

Diagnostic tests for lung function may have provided evidence indicating COPD

significantly limited Farris's physical ability to do basic work activities, but the record

contained no such test.  In the absence of evidence showing poor lung function, Dr.

Pledger's diagnosis was unsubstantiated.  As a consequence, no basis existed for

determining COPD was a severe impairment.  The ALJ did not err in determining that

---

[59]2 The Gale Encyclopedia of Med. 1026 (4th ed.).

[60]*See id*. at pp. 1026-27.

[61]*See* SSA record at p. 417 (writing on Mar. 13, 2008 that Farris was smoking); p.
413 (reporting July 14, 2008 that Farris continued to smoke); p. 449 (writing on Sept. 10,
2008, "Quit Smoke"); p. 445 (writing on Mar. 4, 2009 that Farris continued to smoke and
was positive for cough).

[62]*Id*. at p. 417 (treatment note for Mar. 13, 2008).

COPD was not a severe impairment.

To the extent Farris complained that the ALJ did not consider COPD in determining whether his impairments met a listed impairment, Farris failed to advance an argument. He stated simply that he "objected to the [step three] findings since the ALJ did not fully address all of the impairments at the second step."[63] In the absence of some explanation about why the ALJ should have considered COPD at step three, Farris waived the issue.[64]

To the extent Farris maintained the ALJ's treatment of COPD was inconsistent, he is incorrect. The ALJ must consider a claimant's exertional and non-exertional impairments in determining the claimant's RFC.[65] Shortness of breath is a non-exertional impairment.[66] The ALJ did not err.

Dr. Pledger's opinion. The week after his hearing, Dr. Pledger completed a form titled "medical assessment of ability to do work-related activities (physical)."[67] Therein,

---

[63]Docket entry # 15, p. 4.

[64]See Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. Iowa 2005) ("We reject out of hand [the claimant's] conclusory assertion that the ALJ failed to consider whether he met listings…because ] [he] provides no analysis of the relevant law or facts regarding these listings.").

[65]See 20 C.F.R. § 416.969a.

[66]See id. (listing the inability to tolerate dust or fumes in the work environment as an example of a nonexertional impairment).

[67]SSA record at pp. 513-14.

Dr. Pledger responded to questions about Farris's ability to do work-related activities on a day-to-day basis in a regular work setting.  Dr. Pledger indicated that Farris could not: lift or carry more than 10 pounds occasionally; stand or walk more than 3 hours per day and no more than 30 minutes at a time; sit in one place for more than 3 hours a day and no more than 30 minutes at a time; and climb, balance, stoop, crouch, kneel or crawl.  Dr. Pledger indicated that Farris's impairments affected his ability to reach, and to work at heights and around moving machinery.  The ALJ gave the opinion "some weight," but not "controlling weight."  Farris asserted that the ALJ improperly evaluated the opinion and failed to make a function-by-function assessment of his RFC.[68]

> Under the Commissioner's regulations, a treating physician's opinion is given "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Accordingly, an ALJ should "give good reasons" for discounting a treating physician's opinion.[69]

In this case, the ALJ provided good reasons for discounting the opinions in the medical-assessment form.  The reasons follow:

> …Dr. Pledger's opinion is not supported by the record as a whole and is inconsistent with the claimant's own testimony at the hearing regarding his ability to lift, carry, stand, and sit.  Mr. Farris testified that he felt he could lift up to 40 pounds occasionally and up to 15 pounds frequently

---

[68]Docket entry # 15, p. 5.

[69]*Dolph v. Barnhart*, 308 F.3d 876, 878-79 (8th Cir. 2002).

17

and that he could stand up to 45 minutes and sit for up to 2 hours.  Dr.
Pledger opined that Mr. Farris could lift and carry less than 10 pounds,
stand and/or walk up to 3 hours with only 30 minutes without
interruption, and that he could sit for up to 3 hours with 30 minutes
without interruption.  Dr. Pledger never mentioned extreme symptoms in
the claimant's medical records and Mr. Farris' impairments have been
treated on a very conservative basis since April 2007.  Dr. Pledger has
never increased the claimant's pain medication due to an increase in
symptoms.  There are no indications of total disability being mentioned in
Dr. Pledger's treatment notes.  The medical opinion is without objective
evidence indicating how Mr. Farris' impairments interfere with the
performance of job-related functions.  Dr. Pledger's statement does not
contain citations to medical tests or diagnostic data.[70]

These reasons are "good reasons" because they are supported by the record.  Dr.

Pledger's opinion was unsupported by medically acceptable clinical and laboratory

diagnostic techniques, and the opinion was inconsistent with other substantial evidence.

Dr. Pledger's opinion contradicted his treatment notes.  Rather than document

functional limitation, Dr. Pledger's treatment notes are remarkable for the absence of

functional limitation.  The treatment notes documented complaints of neck, leg and

back pain, and difficulty with raising the left arm, but nothing in the notes supported

Dr. Pledger's opinion about functional limitation.  Although the medical-assessment-

form instructed the physician to "RELATE PARTICULAR MEDICAL FINDINGS TO

ANY ASSESSED REDUCTIONS IN CAPACITY," and cautioned that "THE

USEFULNESS OF YOUR ASSESSMENT DEPENDS ON THE EXTENT TO WHICH

---

[70]SSA record at p. 22.

YOU DO THIS,"[71] Dr. Pledger related no particular medical findings.

The ALJ's opinion reflects careful consideration of Dr. Pledger's treatment notes.

For example, Dr. Pledger's treatment notes documented Farris's long history of

smoking. The ALJ incorporated the effects of long-term smoking in the RFC

determination by restricting Farris from work environments with temperature

extremes, dust, fumes and smoke. The ALJ did not err in evaluating Dr. Pledger's

medical opinion.

To the extent Farris claimed the ALJ failed to do a function-by-function analysis

of his RFC, the ALJ determined that Farris had the ability to do light work "as defined

in 20 CFR 404.1567(b) and 416.967(b)."[72] The cited regulations set forth the

requirements for light work in terms of the exertional functions of lifting, carrying,

walking, standing, sitting, pushing, and pulling.[73] The ALJ also required a sit-stand

---

[71]*Id*. at p. 513.

[72]*Id*. at p. 19.

[73]*See* 20 C.F.R. § 404.1567(b) (DIB) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."). *See also* 20 C.F.R. § 416.967(b) (SSI).

19

option.  Citing the regulatory requirements for light work, and incorporating a sit/stand

option, reflects a function-by-function analysis because the findings addressed all

functional areas.  The ALJ did not err in considering Farris's RFC.

The evaluation of Farris's credibility.  The ALJ found Farris's subjective

complaints and alleged limitations less than fully persuasive.[74]  Farris complained that

the ALJ did not detail the medical evidence discrediting his allegations of pain or

explain why the medical evidence was inconsistent with his allegations.[75]

"In assessing a claimant's credibility, an ALJ must consider all of the evidence

related to the subjective complaints, the claimant's daily activities, observations of third

parties, and the reports of treating and examining physicians."[76]  "The ALJ may

discount complaints of pain if they are inconsistent with the evidence as a whole."[77]

In this case, the ALJ addressed all required considerations:[78] Farris's statements

---

[74]SSA record at p. 22.

[75]Docket entry # 15, pp. 8-9.

[76]*McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

[77]*Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001).

[78]In considering the credibility a claimant's subjective complaints, an ALJ must consider: (1) the claimant's prior work record; (2) observations by third parties and treating and examining physicians relating to such matters as: (a) the claimant's daily activities; (b) the duration, frequency and intensity of the pain; (c) precipitating and aggravating factors; (d) dosage, effectiveness and side effects of medication; and (e) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

about his impairments, Farris descriptions of his daily activities, treatment notes of treating physicians, the opinions of consulting physicians, and Farris's medications.[79] Although Farris maintained the ALJ failed to detail the medical evidence or explain why the medical evidence contradicted his allegations, the ALJ's opinion reflects the opposite.  The opinion reflects a careful comparison of Farris's allegations with the medical evidence and a thorough explanation about why the medical evidence did not support Farris allegations.  For example, although Farris attributed disability, in part, to a crushed right ankle, the ALJ observed that no physician recommended Xrays or treatment for ankle pain.[80]  The ALJ did not err in evaluating Farris's credibility.

The subsequent disability determination.  In his final argument, Farris maintained new evidence shows he was disabled.  The new evidence included: (1) a subsequent favorable decision, (2) Dr. Marvin N. Kirk's report of a physical examination, and (3) Dr. Kirk's "medical assessment of ability to do work-related activities (physical)."[81]  Farris argued that the similarities in Dr. Kirk's opinion and Dr. Pledger's opinion warranted a remand for consideration of his new evidence.[82]

---

[79]SSA record at pp. 20-23.

[80]*Id*. at p. 21.

[81]Docket entry # 5.

[82]Docket entry # 15, pp. 6-7.

"In order to support a remand, new evidence must be 'relevant, and probative of the claimant's condition for the time period for which benefits were denied.'"[83]  In this case, the relevant time period began with the denial of Farris's first applications—August 15, 2007—and ended with the unfavorable decision—October 16, 2009.  Farris's new evidence is not relevant or probative of disability for this time period because the subsequent favorable decision considered a different time period, a time period that began on October 20, 2009.[84]

Dr. Kirk examined Farris on July 10, 2010.[85]  Dr. Kirk completed the medical-assessment-form on September 12, 2010.[86]  Dr. Kirk opined that Farris was "severely limited in all his physical activities,"[87] and supported his opinion with medical findings, but the new evidence does not relate to the relevant time period—August 15, 2007 to October 16, 2009.

Considering the nature of Farris's impairments, it is not surprising that a subsequent ALJ determined Farris was disabled.  Like this case, the ALJ in the subsequent case determined Farris was impaired by degenerative disc disease of the

---

[83]*Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted).

[84]Docket entry # 5, p. 7.

[85]*Id*. at p. 13.

[86]*Id*. at p. 18.

[87]*Id*. at p. 13.

cervical spine.[88]  "Cervical disk disease refers to the gradual deterioration of the spongy

disks in the top part of the spine."[89]  "Cervical disk disease… occurs with **aging**, though

poor posture, repeated lifting, and tobacco use can hasten its course."[90]  Dr. Pledger

documented Farris's long history of tobacco use.  The progressive nature of cervical disc

disease, coupled with Farris's prolonged tobacco use, suggested the likelihood of

eventual disability.

The ALJ in the subsequent case also determined that COPD—in the form of

chronic bronchitis—was a severe impairment.[91]  Like cervical disc disease, chronic

bronchitis is a progressive disease with symptoms that "develop gradually, usually

over years."[92]  The primary cause of chronic bronchitis is cigarette smoking.[93]  Dr. Kirk,

however, explained that Farris's symptoms also flowed from ankylosing spondylosis.[94]

Like chronic bronchitis, ankylosing spondylosis is a progressive disease, which results

---

[88]*Id*. at p. 9.

[89]2 The Gale Encyclopedia of Med. 921 (4th ed.).

[90]*Id*.

[91]SSA record at p. 9.

[92]2 The Gale Encyclopedia of Med. 1023, 1026 (4th ed.).

[93]2 The Gale Encyclopedia of Med. 1025 (4th ed.).

[94]Docket entry # 5, p. 13.

in the loss of spinal mobility and sometimes a consequential inability to inhale deeply.[95]

The progressive nature of Farris's conditions, and the passage of time, explain why the

second ALJ reached a different result, but do not justify a remand.  Likewise, the

difference in Dr. Pledger's treatment notes and Dr. Kirk's examination report evidences

the progressive of Farris's impairments, but does not show that Farris was disabled in

this case.  The ALJ did not err.

Conclusion.  Having determined that substantial evidence supports the

Commissioner's denial of Farris's applications, the court DENIES Farris's request for

relief (docket entry # 2) and AFFIRMS the Commissioner's decision.

It is so ordered this 25th day of July, 2012.


                                        _____
                                        United States District Judge


_____

[95]1 The Gale Encyclopedia of Med. 263 (4th ed.) (describing ankylosing
spondylosis as "causing **pain** and stiffness of the back, progressing to the chest and
neck" and including "difficulty expanding the chest" as a symptom).